IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ALBERT GROTZ, ET AL.          §
                              §
VS.                           §          CIVIL ACTION NO.4:08-CV-344-Y
                              §
THE CITY OF GRAPEVINE, ET AL. §

<u>ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT</u>

Pending before the Court is the Motion for Summary Judgment (doc. #42) filed by defendants the City of Grapevine, Texas ("the City"); Mark Kuppler; Wan Lee; Robert Wall; Gregg Ross; Darin Yarbrough; Barry Mullins; and Marc Shimmick.  Also before the Court is the Motion for Summary Judgment (doc. #43) filed by defendant Richard Torres.  After review, the Court concludes that Plaintiffs have not asserted a constitutional violation by any of the individual defendants.  Thus, their motions for summary judgment will be granted.  And because such a violation is a prerequisite to Plaintiffs' claims against the City, summary judgment will be granted in favor of the City as well.


I.  Background

On June 24, 2006, at approximately 7:34 p.m., Sergeant Mark Kuppler of the City of Grapevine police department arrived at the Grapevine Mills Mall in response to a call that a man who appeared intoxicated and who had an open container of alcohol was loitering near one of the mall's entrances.  (Mot. App. at 1-2.)  Sergeant Robert Wall arrived at the scene within seconds of Kuppler, and the two approached the man who now appeared to be passed out on a bench. (*Id.* at 3-4, 8.)  Next to the man was a six-pack container for an alcoholic beverage, with one full, closed bottle, two empty bottles, and three empty slots with no bottles.  (Resp. App. at 9, 16, 18.)

Kuppler began questioning the man--asking if the man had been drinking and for identification. (Resp. App. Ex. M.[1]) After retrieving the man's identification from his pocket, Kuppler determined the man's name to be Eric Grotz. (*Id.*).

Kuppler also removed two prescription bottles from Grotz's pockets. (*Id.*; Mot. App. at 4, 9.) The prescriptions were for hydrocodone, a pain reliever, and alprazolam, a generic version of the anti-anxiety medication Xanax. (Mot. App. at 4, 9.) The alprazolam prescription, consisting of 120 pills, had been filled on June 19, 2009, and the prescription of hydrocodone, consisting of 20 pills, had been filled on June 22, 2009. (*Id.*) On the video from Kuppler's dashboard camera, Kuppler can be heard asking Grotz how much of the medication he had taken, to which Grotz responds that he takes the medication as needed. (Resp. App. at Ex. M.) Kuppler can also be heard reading the warning label from one of the bottles, which states "Do not drink alcoholic beverages when taking this medication." (*Id.*) Wall opened the bottles and observed a "significant" number of pills remained in each. (Mot. App. at 9.) Wall, trained as a Drug Recognition Expert, additionally checked Grotz's pulse, concluding that it was normal and that there was no indication that Grotz had any medical problems other than alcohol intoxication. (*Id.*; Resp. App. at 9.)

Throughout the officers' encounter with Grotz outside of the mall Grotz sounds lethargic and speaks with slurred and extremely soft speech but is generally able to respond to their questions. (Resp. App. at 9, 14, Ex. M.) When Kuppler had Grotz stand up, he appeared

---

[1] Exhibit M to Plaintiffs' response brief is the video from the camera in Kuppler's police vehicle. Exhibits N and O are videos from the booking area of the City's jail. The Court has viewed each of these videos in reviewing the summary-judgment motions.

unsteady and needed support. (Resp. App. at 9.)  Grotz's eyes were dilated, bloodshot, and watery.  (*Id.* at 16.)  Ultimately, the officers concluded that Grotz was highly intoxicated, with Kuppler concluding he was a danger to himself and others, and Grotz was placed under arrest for public intoxication. (*Id.* at 10, 16; Mot. App. at 4, 9.)  Because Grotz was unsteady on his feet, the officers assisted him into Kuppler's vehicle, and Kuppler took Grotz to the City's jail. (Resp. App. at 10.)

Video from Kuppler's vehicle shows that Grotz laid across the back seat for much of the ride to the jail, passing in and out of consciousness.  (Resp. App. at Ex. M.)  Kuppler occasionally calls back to Grotz, giving Grotz instructions such as "Wake up, we're turning.  I don't want you falling over," and "Sit up Eric, I want to make sure you're alright."  (*Id.*)  Grotz responds to the latter statement by sitting up, head down, eyes closed, then slowly slumping back over onto his side.  (*Id.*)  Grotz does not respond to Kuppler's second request for him to sit up, and Kuppler turns the radio up in an apparent attempt to rouse Grotz.  (*Id.*)  Upon arriving at the jail, Grotz awakens, sits up, and is able to exit the vehicle.  (*Id.*; Mot. App. at 20, 23, 27.)

Kuppler had called ahead for assistance and was met in the jail's bay area, or "sally port," by defendants Officers Darin Yarbrough and Gregg Ross and Detective Wan Lee (Mot. App. at 4, 19, 22, 26.).  Lee opened the rear passenger door of Kuppler's vehicle to allow Grotz to get out.  Lee then left the sally port.  (*Id.* at 19-20.)  Ross assisted Kuppler in getting Grotz into the jail while Yarbrough followed behind.  (*Id.* at 4-5, 23, 27.)

Grotz was taken into a cell and placed on a mat. (*Id.* at 4.)  To reduce the risk of choking in the event Grotz vomited due to his intoxication, he was placed on his side.  (*Id.* at 4, 13, 23, 27.) Officer Barry Mullins, a jailer, inventoried Grotz's property and Grotz's cell door was closed at approximately 7:54 p.m. with Grotz sleeping on his side.  (*Id.* at 5, 13, 23, 27.)

Kuppler informed Mullins that two prescription bottles were found on Grotz and that Grotz was under the influence of alcohol and possibly drugs.  (*Id.* at 5, 14.)  In fact, Grotz was unable to go through the booking process. (Resp. App. at 12.)  Kuppler counted the pills, concluding that only ninety-eight alprazolam pills and only eight hydrocodone pills remained.  (*Id.* at 16.)  Grotz's prescription for alprazolam directed him to take one pill as needed up to twice a day, and his prescription for hydrocodone directed him to take one pill every six hours.  (*Id.* at 15.)  Based on his count of the pills, Kuppler concluded that Grotz had "overtaken" the hydrocodone, but not to the point to give him "cause" to believe it was an "overdose situation."  (*Id.* at 58-59.)  Based on his level of intoxication and the potential for vomiting and choking, Kuppler instructed Mullins to check on Grotz every fifteen minutes, an elevated watch in relation to the normal policy of checking on detainees every hour.  (*Id.* at 7.) Kuppler claims that he did not place a limitation on the heightened checks, believing instead that such checks would last until jail staff determined otherwise.  (Mot. App. at 5.)  However, Mullins understood that the fifteen-minute checks were to last for only an hour.  (*Id.* at 15, 31.)

Kuppler then went to the shift briefing where he informed the incoming shift supervisor, Sergeant Marc Shimmick, of Grotz's

intoxication and of the fifteen-minute checks. (*Id.* at 5-6, 16-17.)
When Kuppler ended his shift at approximately 8:17 p.m., Kuppler
walked by Grotz's cell and heard him snoring. (*Id.* at 6.)

Mullins checked on Grotz at 8:10, 8:18, 8:26, 8:52, and four
times thereafter. (*Id.* at 13-14; Resp. App. at 11.)  Mullins checked
on Grotz by observing him through the window of the cell door. (Mot.
App. at 13-14.)  Mullins could also hear Grotz snoring. (*Id.*)  In
anticipation of the end of his shift, Mullins briefed Jailer Richard
Torres about all detainees, including Grotz.  (Resp. App. at 14.)
Mullins told Torres that Grotz was intoxicated when he arrived and had
not been formally booked in, but did not inform Torres about the
heightened checks, believing they were no longer necessary.  (*Id.* at
13-14, 40.)  When his shift concluded at 11:10 p.m., Mullins checked
on Grotz one last time, hearing Grotz snoring heavily.  (*Id.*)

Torres checked on Grotz once near the beginning of his shift and
did not check on Grotz thereafter. (*Id.* at 24, 53, Ex. N, Ex. O.)  In
fact, no one checked on Grotz after 12:20 a.m.  (*Id.* at 24.)  At 6:00
a.m. on June 25, Torres entered Grotz's cell to give him breakfast.
(*Id.* at 35.)  Grotz was dead, and an after an autopsy, the Tarrant
County medical examiner's office concluded that Grotz had died of
"mixed drug intoxication (ethanol and hydrocodone)."  (Mot. App. at
30.)

Eric's parents, Albert and Linda Grotz, filed this suit in May
2008 under 42 U.S.C. § 1983 on behalf of Eric's estate and in their
capacity as Eric's surviving parents.  They claim that the individual
defendants violated Eric's due-process right to medical care under the
Fourteenth Amendment by acting with deliberate indifference to Eric's
obvious medical needs.  Plaintiffs' claims against the City allege

that the City violated Eric's rights by failing to adopt and maintain policies and procedures to evaluate and monitor intoxicated detainees and by failing to properly train its officers to detect the signs of drug use and possible overdose.

## II. Discussion

### A. Applicable Law

#### 1. Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule

56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* Fed. R. Civ. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

2.   The Right to Medical Care and 42 U.S.C. § 1983

Section 1983 provides a vehicle for the redress of a violation of federal law by those acting under the color of state law.  *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19 (1980).  To prevail on a § 1983 claim, a plaintiff must establish two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law.  *See* 42 U.S.C. § 1983; *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50-51 (1999).

As a pre-conviction detainee, Grotz's constitutional rights regarding medical treatment stem from the Fourteenth Amendment's Due Process Clause.  *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).  "[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).  The appropriate standard for analyzing Grotz's due-process claim "depends on whether the alleged unconstitutional conduct is a 'condition of confinement' or 'episodic act or omission.'" *Gibbs*, 254 F.3d at 548 n.2.  "In an 'episodic act or omission' case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).  On the other hand, in a condition-of-confinement case the challenge is to the "general conditions, practices, rules, or

restrictions of pretrial confinement." *Hare*, 74 F.3d at 644.  To state a condition-of-confinement case, the act or omission of the jailer or similar official "must implement a rule or restriction or otherwise demonstrate the existence of an identifiable intended condition or practice." *Id.* at 645.

Neither Plaintiffs nor Defendants address this issue.  Looking to the complaint, Plaintiffs allege that the individual officers had knowledge that Grotz was intoxicated on alcohol and potentially prescription drugs but failed to get Grotz medical attention or to properly monitor him.  Plaintiffs also complain that the City did not adequately train the individual defendants and failed to institute sufficient policies or procedures for identifying and monitoring detainees potentially suffering from a drug overdose.  Plaintiffs do not allege that any particular condition of Grotz's confinement amounted to harm in and of itself.  *Cf. Brown v. Wichita County*, No. 7:05-CV-0108-O-KA, 2008 U.S. Dist. LEXIS 60679, at *10 (N.D. Tex. Aug. 6, 2008) (citing *Scott,* 114 F.3d at 53 n. 2 (citing examples of condition-of-confinement cases to show the conditions themselves were the harm)).  Here, the individual defendants are "interposed" between Grotz and the City, and the fact that Grotz did not receive sufficient timely treatment is allegedly due to the acts and omissions of the individual defendants rather than some "general conditions, practices, rules, or restrictions." *Cf. id.; also cf. Lee v. Valdez*, No. 3:07-CV-1298-D, 2008 U.S. Dist. LEXIS 68670, at *10 (N.D. Tex. Aug. 29, 2008) (noting that a due-process claim of inadequate medical treatment is a condition-of-confinement case when it "attacks the jail medical care system itself").  Consequently, the Court concludes that this case should be analyzed as complaining of an "episodic act or

omission." *Cf. Nerren v. Livingston Police Dep't*, 896 F.3d 469, 473 (5th Cir. 1996) (complaint that police failed to provide adequate medical care to arrestee who was taken into custody after an automobile accident analyzed as complaining of episodic act).

Accordingly, to establish a due-process violation by an individual defendant, Plaintiffs must establish that the individual defendant acted with "subjective deliberate indifference." *Scott,* 114 F.3d at 54 (discussing *Hare*, 74 F.3d at 649 n.4); *see also Flores v. County of Hardeman*, 124 F.3d 736, 738-39 (5th Cir. 1997). To establish "subjective deliberate indifference," Plaintiffs must show that the individual defendant "had subjective knowledge of a substantial risk of serious harm to [Grotz] but responded with deliberate indifference to that risk." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) (quoting *Hare*, 74 F.3d at 650).

An official's subjective knowledge of a substantial risk to the detainee's health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). It is not enough to show that officials should have known about the risk--actual knowledge is required to impose liability. *Olabisiomotosho*, 185 F.3d at 528 (citing *Farmer*, 511 U.S. at 838). A plaintiff must generally prove that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . [actually drew] the inference." *Farmer*, 511 U.S. at 837. But "a factfinder may [also] conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

The plaintiff must further prove that the official responded to his subjective awareness of a substantial risk of serious harm to the detainee with deliberate indifference. Deliberate indifference is an extremely high standard to meet. *Domino v. TDCJ-ID*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference cannot be inferred from a[n] . . . official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone." *Lawson v. Dallas County,* No. 00-11078, 2002 U.S. App. LEXIS 6543, at *10-11 (5th Cir. Mar. 28, 2002). Instead, "the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756.

As for Plaintiffs' claims against the City, local governments are considered "persons" under § 1983. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978). Therefore, in addition to individuals acting under color of state law, local government entities may also be sued under § 1983. *See id.* The plaintiff must establish that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or was "visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*

"Municipalities are not vicariously liable for the actions of their employees under § 1983." *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996). Rather, there must be a direct causal link between the alleged constitutional deprivation and the municipal policy or custom. *See Piotrowski v. City of Houston*, 51 F.3d 512, 517 (5th Cir. 1995).

11

A municipality may be held liable for a constitutional violation caused by its policy in two ways.   A plaintiff may show "that the policy itself violated federal law or authorized or directed the deprivation of federal rights." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004). A plaintiff may also prove "that the policy was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious consequences." *Id.* Under this latter option, a plaintiff must show that policymakers adopted a policy with deliberate indifference to the known or obvious fact that constitutional violations would result from the policy.   *Id.* Deliberate indifference in this context is an objective standard, *Scott*, 114 F.3d at 54, and is not satisfied by a showing of "simple or even heightened negligence." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).   Objective deliberate indifference is most often shown by establishing a pattern of similar violations.   *See Johnson*, 379 F.3d at 309.


### 3.  Qualified Immunity

When a plaintiff seeks damages from a public official for actions taken under the color of state law, the public official may invoke his right to qualified immunity.   *See Hafer v. Melo,* 502 U.S. 21, 26 (1991).   Public officials performing discretionary functions enjoy immunity from suits for damages, provided their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be

resolved at the earliest possible stage in the litigation. *See Hunter v. Bryant,* 502 U.S. 224, 227 (1991). The plaintiff bears the burden of showing qualified immunity's inapplicability. *See McClendon v. City of Colombia,* 305 F.3d 314, 323 (5th Cir. 2002)(en banc).

Under *Saucier v. Katz*, Courts in this circuit have applied a three-step inquiry in assessing whether a governmental official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Conroe Creosoting Co. v. Montgomery County.*, 249 F.3d 337, 340 (5th Cir. 2001); *see also Ashfaq v. Anderson*, 603 F. Supp. 2d 936, 941 n.1 (N.D. Tex. 2009) (noting that although "the Supreme Court has consistently spoken of the qualified immunity analysis as a two-step process, the Fifth Circuit has long recognized that the high Court's analytical framework should be dissected into three steps"). First, a court determines whether the plaintiff has actually alleged the violation of a constitutional or statutory right. *See Conroe Creosoting Co.*, 249 F.3d at 340. If the plaintiff has, then a court is to determine whether, at the time of the alleged violation, that right was so clearly established that a reasonable public official in the defendant's situation would have understood that his conduct violated that right. *See Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir. 1993). Thus, "whether an official protected by qualified immunity may be held personally liable turns on the 'objective reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987). Finally, a court assesses "whether the record indicates that the violation occurred, or gives rise to a genuine issue of material fact as to whether the defendant actually engaged in the conduct that [is alleged to have]

violated the clearly established right." *Conroe Creosoting*, 249 F.3d at 340.   Under this framework, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

This sequence for the analysis is no longer mandated by the Supreme Court's decision in *Katz.   See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).   That is, although as a practical matter the sequence set out in *Katz*, as well as United States Court of Appeals for the Fifth Circuit's precedent under *Katz*, is "often appropriate" and helpful as a practical matter, a court may exercise its discretion to determine which portion of the analysis should be addressed first under the circumstances of the case.   *See id.* ("[W]hile the sequence set forth [in *Katz*] is often appropriate, it should no longer be regarded as mandatory."); *see also Ashfaq*, 603 F. Supp. 2d at 941 n.1 (noting the Supreme Court's modification of the *Katz* framework in *Pearson*).   Admittedly, *Pearson* established the "discretion [to] decid[e] which of the *two* prongs of the qualified[-]immunity analysis should be addressed first." *Pearson*, 129 S. Ct. at 818 (emphasis added).   But given that the three-part test employed by the Fifth Circuit is derived from the Supreme Court's two-part test, and that the third portion of the Fifth Circuit's test is implicit in the first portion of the Supreme Court's articulation of the test[2], *Pearson* frees the Court to address even the Fifth Circuit's three-part test in any order appropriate under the circumstances of the case.

_____

[2] *See Pearson*, 129 S. Ct. 818 (describing the first portion of the qualified-immunity analysis as involving a determination of "whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right"); *see also Morris v. Dearborne*, 181 F.3d 657, 666 (5th Cir. 1999) (stating that the "third prong is not at issue [when the defendant] does not challenge [the] facts [as] pleaded by [the p]laintiff").

B. Analysis

   1. Sergeant Kuppler

Kuppler argues that there is no evidence that he had subjective awareness that Grotz had taken the pills on the day of his arrest and, therefore, it cannot be said that he had subjective knowledge of a substantial risk to Grotz's health.  But after review of the facts as alleged by Plaintiffs, the Court concludes otherwise.  When Kuppler arrived at the Grapevine Mills mall, Grotz was passed out a bench near a mall entrance.  Near Grotz was a six-pack container, with two empty bottles and three empty spaces with no bottles.  In searching for Grotz's identification, Kuppler found two prescription-medication bottles and noted that the prescriptions were not to be taken with alcohol.  Kuppler described Grotz as lethargic, with watery, bloodshot eyes, speaking with soft, slurred speech, and highly intoxicated. Grotz needed assistance standing and walking.  After arriving at the jail, Kuppler counted the pills remaining in the bottles.  Based on his count, and including both the day the prescriptions were filled and the day of Grotz's arrest as days on which Grotz could have taken the prescribed amount, Kuppler knew that the number of pills missing exceeded the prescribed dosage.  Specifically, Kuppler concluded that two more hydrocodone pills were missing than was consistent with the prescribed dosage, and his count of the alprazolam indicated that ten more of these pills were missing than should have been.  (Resp. App. at 58.)   Indeed, Kuppler stated out loud that Grotz had definitely overtaken his medication and, in briefing Mullins, stated that Grotz's intoxication could be due to drugs.  (*Id.* at 14.)

Kuppler insists that he concluded that Grotz's consumption of the medication could be in accordance with normal usage.  But "[p]roof of

15

subjective awareness is not limited to the purported recollections of the individuals involved." *Conn v. City of Reno*, 572 F.3d 1047, 1057 (9th Cir. 2009). Rather, "[w]hether [an] official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [and] a factfinder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. The facts of which Kuppler was aware and his own statements undermine his claimed belief that Grotz's consumption of the medication was consistent with normal use. Although a close call, if true, the foregoing facts are sufficient to support a finding that Kuppler had subjective knowledge of a substantial risk to Grotz's health. *Cf. Harper v. Lawrence County*, No. 09-10226, 2009 U.S. App. LEXIS 22029, at *13 (11th Cir. Oct. 7, 2009) (concluding that plaintiff had sufficiently alleged jail personnel had subjective awareness of a detainee's need for medical assistance by alleging that such personnel were aware that the detainee was exhibiting the symptoms of alcohol withdrawal); *McRaven v. Sanders*, 577 F.3d 974, 2009 U.S. App. LEXIS 18816, *9-10 (8th Cir. 2009) (concluding that an officer had subjective knowledge of the risk that a detainee had overdosed on prescription medication when, inter alia, the officer witnessed the detainee's extreme intoxication and knew that the detainee had consumed the drugs in excess of prescribed dosages); *cf. Burnette v. Taylor*, 533 F.3d 1325, 1328, 1331 (11th Cir. 2008) (concluding that officer was not subjectively aware of a detainee's need for medical assistance when, despite finding the detainee in possession of prescription medication and exhibiting signs

16

of drug use, those signs were not severe and the officer had no knowledge of the amount of drugs taken).

Kuppler cites *Morris v. City of Alvin*, in arguing that he did not have subjective knowledge of a substantial risk to Grotz's health. In *Morris*, the plaintiff argued that a municipality failed to properly train jail personnel to recognize the signs of a drug overdose. *See Morris v. City of Alvin*, 950 F. Supp. 804, 806 (S.D. Tex. 1997). Noting that a plaintiff must identify a city policy that caused the alleged constitutional violation, the court granted the defendant municipality's motion to dismiss, concluding that not only had the plaintiffs failed to identify an "official policy" within the meaning of section 1983, it did not appear that the additional training proposed by the plaintiffs "would have prevented [the] overdose." *Id.* The court reasoned that the detainee had taken the drugs prior to her arrest and that her overdose was a "hidden medical problem[]" the symptoms of which "did not manifest themselves until after [the detainee] had been taken into custody." *Id.*

*Morris* is distinguishable from the claim against Kuppler. *Morris* dealt with an overdose in its latent stages, while Grotz was in a severely intoxicated state and in possession of prescription medications and alcohol when Kuppler and Wall found him. More specifically, *Morris* discussed the detainee's lack of external signs of an overdose in the context of concluding that additional training of, and screening by, jail personnel could not have *prevented* the overdose. *Morris* did not conclude that an officer cannot have subjective awareness of the risk that a detainee has overdosed merely because the detainee did not ingest the drugs in the officer's presence or that an officer is not obligated to take appropriate

17

action when presented with facts suggesting that a detainee has taken an overdose of drugs.  Thus, contrary to Kuppler's arguments, the mere fact that Grotz ingested the alcohol and medication––the cause of his need for medical assistance––before he and Wall arrived at the mall, does not dictate a conclusion that Kuppler was not aware of Grotz's need for medical assistance.

Even so, Kuppler is entitled to summary judgment in his favor. Plaintiffs must show that Kuppler not only had subjective knowledge of a substantial risk to Grotz's health, but that he acted with deliberate indifference to that risk.  The undisputed evidence is that while questioning Grotz at the mall, Kuppler asked Grotz when he last took his medication.  Grotz's initial response is inaudible on the video from Kuppler's dashboard camera, but Grotz eventually responds that he takes his medication as needed.  Wall arrived at the scene and took Grotz's pulse, concluding there was no immediate threat to Grotz's health.  Kuppler was aware of Wall's training and relied on his assessment.  Once at the jail, Kuppler laid Grotz on his side to keep him from choking in the event he vomited.  Kuppler instructed jailers to check on Grotz every fifteen minutes for at least the first hour of his detention, informed both jailers and the oncoming shift supervisor of Grotz's intoxication, and personally checked on Grotz through the window to his cell before leaving, observing Grotz lying on his side and hearing him snoring.

Plaintiffs argue that these actions were insufficient, and that Kuppler should have sought professional medical attention for Grotz. But liability for Grotz's death cannot be imposed on Kuppler merely because he did not take an ideal course of action.  To support their claim that Kuppler acted with deliberate indifference to the excessive

risk of which he was aware, Plaintiffs must establish that Kuppler "refused to treat [Grotz], ignored [Grotz's] complaints, intentionally treated [Grotz] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756; *see also Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (stating that to prove deliberate indifference the plaintiff must show that the officer's "response indicates [he] subjectively intended that harm occur"). Kuppler took measures to ensure Grotz's well being. Thus, Plaintiffs have not satisfied their burden to show that Grotz's due-process rights were violated as a step to overcoming Kuppler's qualified-immunity defense.

### 2.   Officer Mullins

Kuppler informed Mullins of Grotz's intoxicated state and that Grotz was in possession of prescription medications. Kuppler told Mullins that Grotz's intoxication could be due to medication as well as alcohol and, after counting the pills, Kuppler told Mullins Grotz had overtaken his hydrocodone. (Resp. App. at 14, 58.) And Mullins observed Grotz's extremely intoxicated state. Thus, Mullins was specifically informed of the fact that Grotz had possibly overdosed on his medication. This is sufficient to create a fact issue on Mullins's subjective knowledge.

But even assuming Mullins had subjective knowledge of a substantial risk to Grotz's health, he did not act with deliberate indifference toward that risk. Mullins checked on Grotz four times during the first hour of Grotz's detainment and approximately every hour thereafter. Mullins informed Torres of Grotz's condition as well. Again, Plaintiffs complain that the checks performed by

19

Mullins--observing Grotz through the window of the cell door--were insufficient to properly assess Grotz's condition.  But just as with Kuppler, the fact that Mullins did not take the best course of action does not amount to deliberate indifference.  *See Domino*, 239 F.3d at 756.  Indeed, even if Mullins's actions were unreasonable, it is not enough to establish deliberate indifference.  *See Lawson*,, 2002 U.S. App. LEXIS 6543, at *10-11 ("Deliberate indifference cannot be inferred from a[n] . . . official's mere failure to act reasonably . . . .").

### 3.  Sergeant Wall

Similar to Kuppler, Wall was aware of evidence that Grotz had been drinking, saw that prescription medications were found on Grotz, knew that such medications were not to be mixed with alcohol, and saw Grotz's extremely impaired state.  But although Wall at the scene of Grotz's arrest opened the bottles and noted that pills were missing, Wall did not count the pills as did Kuppler. (Mot. App. at 9.)  Thus, unlike Kuppler, while Wall had some facts that might have indicated Grotz had mixed his medications with alcohol, he did not know that the amount of medication missing was in excess of the prescribed dosages; significantly so in the case of the alprazolam.

Generally an officer cannot be said to have subjective knowledge of a substantial risk to a detainee's health unless the officer is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw[s] the inference." *Farmer*, 511 U.S. at 837.  While Kuppler not only counted the pills, but stated aloud that Grotz had overtaken his pills and told Mullins that Grotz's intoxication might be due to drugs as well

as alcohol, there is no evidence that Wall came to such a conclusion. Moreover, without knowledge that Grotz had in fact exceeded the prescribed dosage for both of his medications in the short period between the dates his prescriptions were filled and the time of his arrest, it cannot be said that the risk that Grotz had overdosed was obvious to Wall.  Consequently, Plaintiffs have not shown that Wall was subjectively aware of a substantial risk to Grotz's health.

Nor have they established that Wall responded to the knowledge he did have with deliberate indifference.  Wall, trained as a drug recognition expert, took Grotz's pulse, determining it to be normal and concluding that Grotz's health was not in immediate jeopardy. Plaintiffs complain that this course of action was insufficient, and that Wall should have summoned professional medical assistance.  But Wall's failure to take the best course of action is not deliberate indifference.

Plaintiffs argue that given his training, Wall knew that the symptoms of an overdose develop over time, not immediately upon ingestion of the drugs.  Plaintiffs insist that Wall should have taken this into consideration in responding to Grotz's intoxication and the possibility that he had overdosed on his medication.  Despite the fact that both sides speak of Wall's training as involving the recognition of the symptoms of drug use, there is no evidence before the Court about how Wall was trained or what knowledge he had as a result of that training.  Plaintiffs bear the burden not only on their due-process claim, but on overcoming Wall's qualified-immunity defense as well.  Thus, the lack of evidence as to Wall's training prevents the Court from assessing how such training should have influenced Wall's response.  Regardless, Wall took some action and knew that Grotz would

be in the custody and supervision of Kuppler, and then of the City jail.   Hence, Plaintiffs have not established that Wall acted with deliberate indifference.

### 4.  Jailer Torres

According to Plaintiffs, Torres was subjectively aware of a substantial risk to Grotz's health because Mullins informed him of it. Just before ending his shift, Mullins briefed Torres about all detainees, including Grotz.  Plaintiffs insist Torres knew that Grotz was very intoxicated, that the intoxication might be due to drug use as well as alcohol, and that Grotz needed to be checked on due to his level of intoxication.

Even accepting these assertions as true, they do not establish that Torres had subjective knowledge that Grotz was in serious need of medical care.  The Fifth Circuit has concluded that the fact that a detainee exhibits signs of intoxication, "including confusion, slurred speech, and loss of coordination," alone does not give an officer knowledge that the detainee is in serious need of medical care.  *See Hines v. Henson*, 293 Fed. Appx. 261, 263 (5th Cir. 2008).

Moreover, even assuming these facts were sufficient to establish subjective knowledge of a substantial risk to Grotz's health, under the third portion of the qualified-immunity analysis a court must determine if the evidence "gives rise to a genuine issue of material fact as to whether the defendant actually engaged in the conduct that [is alleged to have] violated the clearly established right." *Conroe Creosoting,* 249 F.3d at 340.  Plaintiffs' evidence of Torres's subjective knowledge is a statement by Mullins that he informed Torres of Kuppler's "instructions" and a statement by Torres that Mullins

told him Grotz was "very intoxicated."  Nothing in these statements
suggests that Torres was told of Grotz's potential drug use, or that
heightened monitoring of Grotz was necessary due to his intoxication.
To the contrary, Mullins understood Kuppler's instructions to be that
Grotz needed heightened observation for the first hour of his
detention and then could be monitored under ordinary jail procedures.
Admittedly, Torres did not do even this much, but his failure to check
on Grotz hourly in accordance with jail policy was not an act of
deliberate indifference to knowledge of a substantial risk to Grotz's
health.

### 5.  Sergeant Shimmick

After arriving at the jail with Grotz, Kuppler briefed Shimmick,
the oncoming shift supervisor, of Grotz's intoxication and of the fact
that he had requested heightened monitoring of Grotz.  There is no
evidence that Kuppler informed Shimmick that Grotz's intoxication may
have involved drugs or that drugs were found on Grotz.  The general
information provided to Shimmick on Grotz does not show that Shimmick
had subjective knowledge of a substantial risk of harm to Grotz.  *Cf.*
*Hines*, 293 Fed. Appx. at 263 (concluding evidence that jailers were
aware of detainee's intoxication did not show the jailer were aware
the detainee needed medical treatment).

Plaintiffs argue that officers in supervisory positions, such as
Shimmick, cannot avoid contact with a detainee and thereby avoid
knowledge of risks to the detainee's health in an effort to evade
liability.  But there is no evidence that Shimmick was purposefully
avoiding information about detainees.  Instead, the evidence is that

Kuppler briefed Shimmick on Grotz's condition and told Shimmick that heightened monitoring had been ordered.

### 6.  Claims Against the City

Finally, the City seeks summary judgment on the claims against it.  Plaintiffs respond that the City's request is premature because, in response to the individual defendants' asserting qualified immunity, this Court ordered Plaintiffs to file a Rule 7(a) reply and provided the individual defendants an opportunity to seek summary judgment based on such defense while all other aspects of the case were stayed.  Plaintiffs also assert that they are entitled to additional discovery from the City.

But as the City argues, Plaintiffs have pointed to no specific area in which discovery is needed or how such discovery will affect this case.  *Cf. Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 162 (5th Cir. 2006) (stating, under Fed. R. Civ. P. 56(f), that a "non-movant seeking relief under Rule 56(f) must show: (1) why he needs additional discovery and (2) how that discovery will create a genuine issue of material fact").  More importantly, Plaintiffs have not established that any action by a City official constituted a violation of Grotz's constitutional rights, which is a predicate to their claims against the City.  *See Flores v. County of Hardeman*, 124 F.3d 736, 739 (5th Cir. 1997) (noting that only when a plaintiff has first established that a municipal official acted with subjective deliberate indifference may the municipality be held liable for a due-process violation under an episodic-act-or-omission analysis).  Consequently, despite the stay, the City has established that

Plaintiffs' claims against it fail as a matter of law and that summary judgment is appropriate.


III.  Conclusion

The Court concludes that Plaintiffs have not established that any of the officers or jail personnel involved with Grotz's arrest and detention violated his constitutional due-process right not to have his serious medical needs met with deliberate indifference.  Thus, the Court need not proceed with the remainder of the qualified-immunity analysis.  *See Brewer*, 3 F.3d at 820 (stating court must perform steps two and three of the qualified-immunity analysis "if the plaintiff has asserted the violation of a constitutional right").  Moreover, Plaintiffs have not shown that any of the individual defendants violated Grotz's right to medical care as a prerequisite to their claims against the City.

Accordingly, the motions for summary judgment are GRANTED.  And because all other defendants and claims have been dismissed, (docs. #16, 23, 37, 41), a separate order of final judgment will follow.

SIGNED October 22, 2009.


_Terry R. Means_
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE